**No. 25-13731-A**

---

**IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT**

---

Noach Newman, Adin Gess, and Natalie Sanandaji

*Plaintiffs-Appellants*,

v.

The Associated Press

*Defendant-Appellee.*

Appeal from the United States District Court
for the Southern District of Florida

No. 1:24-cv-20684-KKM

---

# APPELLANTS' OPENING BRIEF

---

Etan Mark
Mark Ferrer & Hayden
80 SW 8th Street, Ste 1999
Miami, FL 33130
305.374.0440
etan@mfh.law

David I. Schoen
Schoen Law Firm, LLC
2800 Zelda Road, Suite 100-6
Montgomery, AL 36106
334.395.6611
schoenlawfirm@gmail.com

Mark Goldfeder
Rachel Sebbag
National Jewish Advocacy Center
1954 Airport Road, Suite 1196
Atlanta, GA 30341
332.278.1100
mark@njaclaw.org
rachel@njaclaw.org

*Attorneys for Appellants*
Noach Newman, Adin Gess, and
Natalie Sanandaji

## Statement Regarding Oral Argument

Plaintiffs-Appellants request oral argument as it would aid the Court's decisional process in this case involving several complex factual and legal issues regarding claims raised pursuant to the Antiterrorism Act, 18 U.S.C. § 2333 ("ATA"), as amended by the Justice Against Sponsors of Terrorism Act ("JASTA"), Pub. L. No. 114-222 (2016), and Florida Statute § 772.13.

## Table of Contents


**Page**

Statement Regarding Oral Argument .......... i

Table of Contents .......... ii

Table of Citations .......... v

Statement of Jurisdiction .......... 1

Statement of the Issues .......... 1

Statement of the Case .......... 2

I. Factual Background .......... 2

A. Plaintiffs-Appellants: Survivors of the Infamous October 7 Attack .......... 4

B. The AP Trades Unparalleled Access to Hamas In Exchange For Supporting the FTO's PR Efforts .......... 5

i. Hamas's Relationship with Defendant-Appellee, the Associated Press .......... 7

ii. The AP Knowingly Assigned and Paid Hamas Affiliates .......... 8

C. The Associated Press's Knowingly Struck a Deal with the Devil .......... 11

II. Procedural History .......... 13

Standard of Review .......... 15

Summary of the Argument .......... 16

Argument .......... 18

I. The District Court Committed Reversible Error in Misapplying the Motion to Dismiss Standard ........ 18

A. The District Court Erred by Construing Facts Against Appellants and Resolving Factual Disputes in the AP's Favor ........ 18

i. The District Court Erred in Discrediting Appellants' Assertions Regarding the AP Affiliation of the Terror Attack Participants ........ 19

ii. The District Court Erred in Discrediting Appellants' Assertions Regarding the Hamas Affiliation of the Terror Attack Participants ........ 21

iii. The District Court's Error Comprehensively Infected its Evaluation of Appellants' Claim for Intermediary Liability ........ 26

B. The District Court Impermissibly Considered Extrinsic Evidence Without Converting the Motion to Dismiss ........ 29

II. The SAC Plausibly Alleged Secondary Liability Under the ATA, and therefore the District Court's Dismissal of Count I Should be Reversed ........ 31

A. The ATA Provides for Broad Relief and Two Frameworks for Evaluating ATA Claims ........ 32

B. The District Court Erroneously Held that Appellants Failed to Plead "General Awareness" ........ 35

C. The District Court Did Not Apply the Proper Test for Intermediary Liability under the ATA ........ 36

D. The AP Was Aware of the Terrorist Participants' Ties to Hamas ........ 39

E. The Terror Attack Participants' Notorious Intertwinement with Hamas Supports the AP's "General Awareness" of FTO Support ........ 42

F. The District Court Erroneously Held that Appellants Failed to Plead "Knowing and Substantial Assistance" ......45

G. Plaintiffs' Allegations Satisfy the *Halberstam* Element of Knowingly Providing Substantial Assistance to Hamas .....46

H. Appellants' Allegations Demonstrate Conscious and Culpable Participation, As Well As Systematic and Pervasive Support, as Put Forth in *Twitter* ..........................51

Conclusion ..........................................................................................................54

Certificate Of Compliance .....................................................................56

Certificate Of Service ..........................................................................57

## Table of Citations

**Cases** **Page(s)**

*Adinolfe v. United Techs. Corp.*,
768 F.3d 1161 (11th Cir. 2014) ........................................ 18, 22, 23, 24, 25, 27, 28

*Armstrong v. Floyd Cnty.*,
No. 4:13-CV-0050-HLM, 2013 WL 8711442 (N.D. Ga. Dec. 3 ..........................27

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ................................................................ 15, 16, 18

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ................................................................ 16, 18, 24

*Bernhardt v. Islamic Rep. of Iran*,
47 F.4th 856 (D.C. Cir. 2022) .......................................................... 36, 39

*Boim v. Holy Land Found. for Relief & Dev.*,
549 F.3d 685 (7th Cir. 2008) ........................................................... 46, 48

*Caterpillar Fin. Servs. Corp. v. Venequip Mach. Sales Corp.*,
147 F.4th 1341 (11th Cir. 2025) ...................................................... 15, 16

*Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*,
511 U.S. 164 (1994) ..........................................................................32

*Chaparro v. Carnival Corp.*,
693 F.3d 1333 (11th Cir. 2012) .................................................. 18, 27, 28

*Drexler v. Trans Union, LLC*,
No. 8:20-CV-2366-30JSS, 2020 WL 8299761 (M.D. Fla. Dec. 15, 2020) .........30

*E.E.O.C. v. Ready Mix USA*,
No. 2:09-CV-923-MEF-TFM, 2010 WL 3398991 (M.D. Ala. Aug. 26, 2010) ..26

*Garfield v. NDC Health Corp.*,
466 F.3d 1255 (11th Cir. 2006) .......................................................30

*Halberstam v. Welch*,
705 F.2d 472 (D.C. Cir. 1983)................. 30, 33, 34, 35, 40, 43, 46, 47, 49, 51, 52

*Honickman v. BLOM Bank SAL*,
6 F.4th 487 (2d Cir. 2021) ........................................................ 36, 44, 47

*Jan et al. v. People Media Project*,
783 F. Supp. 3d 1300 (W.D. Wash. 2025) ................................. 42, 46, 48, 49, 53

*Jones v. Auto. Ins. Co.*,
917 F.2d 1528 (11th Cir. 1990) ...................................................... 29, 30

*Kaplan v. Lebanese Canadian Bank, SAL*,
999 F.3d 842 (2d Cir. 2021) ............................................... 35, 38, 39, 50

*Miller v. Arab Bank, PLC*,
372 F. Supp. 3d 33 (E.D.N.Y. 2019) ........................................ 38, 46, 48

*MSP Recovery Claims, Series LLC v. Metro. Gen. Ins. Co.*,
40 F.4th 1295 (11th Cir. 2022) .......... 53
*Nunez v. J.P. Morgan Chase Bank, N.A.*,
648 F. App'x 905 (11th Cir. 2016) .......... 23
*Nye & Nissen*,
336 U.S. 613 (1949) .......... 34
*Page v. Postmaster Gen. & Chief Exec. Officer of the U.S. Postal Serv.*,
493 F. App'x 994 (11th Cir. 2012) .......... 24
*Poulsen v. Publix Super Markets, Inc.*,
302 F. App'x 906 (11th Cir. 2008) .......... 31
*Renfroe v. Nationstar Mortgage, LLC*,
822 F.3d 1241 (11th Cir. 2016) .......... 19, 21, 22, 24
*Roberts v. Carnival Corp.*,
824 Fed. Appx. 825 (11th Cir. 2020) .......... 25
*Speaker v. U.S. Department of Health & Human Services Centers for Disease Control & Prevention*,
623 F.3d 1371 (11th Cir. 2010) .......... 28, 29
*Turner v. Burnside*,
541 F.3d 1077 (11th Cir. 2008) .......... 26
*Twitter, Inc. v. Taamneh*,
598 U.S. 471 (2023) .......... 34, 48, 50, 51, 52
*United States ex rel. Sedona Partners LLC v. Able Moving & Storage Inc.*,
146 F.4th 1032 (11th Cir. 2025) .......... 28
*Vernon v. Med. Mgmt. Assocs., Inc.*,
912 F. Supp. 1549 (S.D. Fla. 1996) .......... 28
*Warren v. DeSantis*,
631 F. Supp. 3d 1188 (N.D. Fla. 2022) .......... 28
*West v. Warden*,
869 F.3d 1289 (11th Cir. 2017) .......... 15
*Wildman v. Deutsche Bank Aktiengesellschaft*,
No. 21-CV-04400 (HG) (RML), 2022 WL 17993076 (E.D.N.Y. Dec. 29, 2022) .......... 49
*Young Apts., Inc. v. Town of Jupiter*,
529 F.3d 1027 (11th Cir. 2008) .......... 16

**Statutes**

18 U.S.C. § 2333 .......... i, 1, 2, 14, 31, 32, 33
18 U.S.C. § 2339A .......... 14
18 U.S.C. § 2339B .......... 14

28 U.S.C. § 1291 ....................................................................................................1
28 U.S.C. § 1331 ....................................................................................................1
Fla. Stat. § 772.13 ............................................................................... i, 2, 14, 31
Pub. L. No. 114-222 (2016) ........................................................................ i, 32

**Rules**

Federal Rules of Appellate Procedure Rule 32(a)(7)(B) ........................................56
Federal Rules of Appellate Procedure Rule 4(a) ......................................................1
Federal Rules of Civil Procedure Rule 8 ……………………………..17, 18, 21, 28
Federal Rules of Civil Procedure Rule 12(b)(6)………………15, 18, 23, 24, 28, 29

## Statement of Jurisdiction

The United States District Court for the Southern District of Florida had federal question jurisdiction pursuant to 28 U.S.C. § 1331 and 18 U.S.C. §§ 2333 and 2334. This Court has jurisdiction pursuant to 28 U.S.C. § 1291 because the District Court's September 28, 2025, Order, Doc 154 ("Order") is a final decision granting the Defendant-Appellee's motion to dismiss with prejudice. This appeal is timely, consistent with Rule 4(a) of the Federal Rules of Appellate Procedure, because Plaintiffs-Appellants' filed their notice of appeal, Doc 155, within 30 days of the entry of the district court's Order.

## Statement of the Issues

I. Whether the district court erred in misapplying the standard for adjudicating a motion to dismiss by construing facts against and declining to make reasonable inferences in favor of Plaintiffs-Appellants and resolving factual disputes in Defendant-Appellee's favor.

II. Whether the district court improperly converted Defendant-Appellee's motion to dismiss, Doc 109, into a motion for summary judgment without notice.

III. Whether the district court erred in dismissing Plaintiffs-Appellants' Second Amended Complaint ("SAC"), Doc 99, on the basis that Plaintiffs-Appellants had insufficiently pled secondary/intermediary liability for aiding and

abetting an act of international terrorism, pursuant to 18 U.S.C. § 2333(d)(2), and the near-identical claim under Fla. Stat. §§ 772.13(1).

## Statement of the Case

### I. Factual Background

In the early morning hours of October 7, 2023, the borders of the sovereign State of Israel were breached by terrorists from the neighboring Gaza Strip ("October 7" or "Terror Attack"). SAC, ¶¶ 1, 40. Some 1,500 Hamas terrorists and its allies tortured and slaughtered innocent civilians and Israeli soldiers guarding the border in what became the bloodiest and deadliest attack on the Jews since the Holocaust. *Id.* What were once quiet, peaceful kibbutzim in southern Israel became killing fields. Whole families were mutilated and murdered; women were raped en masse. *Id.* at ¶¶ 40–43. At the Nova music festival, at least 260 young people were butchered. *Id.* at ¶¶ 1, 41–43. All told, Hamas and its allies killed more than 1,200 people, including 32 Americans, injured 6,900, and kidnapped 251 hostages. *Id.* at ¶ 1.

Hamas's jihad went beyond those literally attacked on that day. The terrorists livestreamed their bloody rampage and embarked on a worldwide propaganda effort to justify their crimes against humanity and inspire others to join their "holy" war against the Jews. *Id.* at ¶¶ 1–2, 44–47. Hamas effectuated its media strategy by drawing on long-time agents in the media carefully placed and cultivated years in

advance, and deliberately included in the Hamas invasion teams on October 7 to get exclusive access to the terror in real time. *Id.* at ¶¶ 44–47.

Defendant-Appellee The Associated Press ("Appellee" or "AP") had, for years, enjoyed a close relationship with Hamas, ceding editorial control to the terrorists in exchange for receiving exclusive access to the terror group and its activities. *Id.* at ¶¶ 38, 61. This included paying Hamas affiliates as "journalists" and publishing their "work" on the AP website; at least one of these "journalists" was known by the AP to be a Hamas affiliate *for at least five years* while the AP continued to employ him. *Id.* at ¶¶ 2–4, 49–54, 58, 63. Early in the morning on October 7, the AP's inside-man with Hamas informed them of the impending violence.[1] *Id.* at ¶¶ 53–54. Rather than alerting the authorities, or, at the very least, refusing to pay actual participants in a terror attack for their so-called "photojournalism," the AP opted to commission a known Hamas affiliate, to send him into the heart of the bloody chaos, publish his resultant photographs, and compensated the Hamas affiliate for his trouble. *Id.* at ¶¶ 53–54. Other Hamas-affiliated "journalists" followed, and were similarly paid and credited for their photographs by the AP. *Id.* at ¶¶ 63, 102–107.

---

[1] The unredacted version of the SAC was filed under seal at Doc 105. After the district court removed certain confidential designations from Exhibits B, C, and D to the SAC (Doc 136), they were filed in the docket. Doc 139.

This appeal arises out of the district court's improper dismissal of claims for relief by October 7's victims for damage suffered from the AP's breach of U.S. counterterrorism laws through their unique, sustained, and knowing support of Hamas's acts of terror. Specifically, Appellee knowingly commissioned and compensated Hamas-affiliated "journalists" who accompanied Hamas terrorists in their invasion of Israel, and published the resultant photographs. *Id.* at ¶¶ 13–14, 130–173.

### A. Plaintiffs-Appellants: Survivors of the Infamous October 7 Attack

Plaintiffs-Appellants (collectively, "Appellants") are three individuals who have suffered due to AP's material support for Hamas, a designated Foreign Terrorist Organization ("FTO"), by the U.S. State Department.

Appellant Noach Newman is a dual American-Israeli citizen. *Id.* at ¶ 26. His brother David Yair Shalom Newman, also a dual American-Israeli citizen, attended the Nova Festival on October 7, where Hamas terrorists murdered him as he saved other festival-goers' lives. *Id.* Newman has suffered and continues to suffer severe mental anguish and extreme emotional pain and suffering as a result of Appellee's aiding-and-abetting Hamas by compensating Hamas affiliates. *Id.*

Appellant Adin Gess is an American citizen who lived with his family in Kibbutz Holit on October 7. *Id.* at ¶ 27. Gess was not at home during the massacre but witnessed the nightmare play out on the kibbutz's communal WhatsApp group;

he watched his friends and community members beg for help before they were slaughtered. *Id.* Gess and other kibbutz survivors were evacuated and have yet to return as of this appeal. *Id.* Gess, and the entire kibbutz, lost everything on October 7, from physical possessions to their entire way of life in their once-peaceful community. *Id.* Gess has suffered and continues to suffer severe mental anguish, extreme emotional pain, and suffering as a result of Appellee's aiding-and-abetting Hamas by compensating Hamas affiliates. *Id.*

Appellant Natalie Sanandaji, an American citizen and resident, was visiting Israel on October 7, where she attended the tragic Nova Festival. *Id.* at ¶ 28. Sanandaji survived the terror onslaught, fleeing for hours, by car and by foot, witnessing the atrocities first-hand and literally running through terrorists' gunfire. *Id.* After approximately four hours running through the fields of southern Israel, Sanandaji was saved by a good Samaritan. *Id.* Sanandaji has suffered and continues to suffer severe mental anguish, extreme emotional pain, and suffering as a result of Appellee's aiding-and-abetting Hamas by compensating Hamas affiliates. *Id.*

### B. The AP Trades Unparalleled Access to Hamas In Exchange For Supporting the FTO's PR Efforts

Hamas, a U.S.-designated FTO, was founded in December 1987. *Id.* at ¶ 30. Its goal is simple, as stated in its founding charter: the elimination of the State of Israel and all Jews. *Id.* at ¶ 30. Hamas aims to achieve its bloody mission through violent jihad, and through the use of global media as a propaganda arm to propagate

falsehoods that demonize Israel, glorify "resistance," and at the same time, infantilize itself as a victim retaliating against a mythical settler-colonial oppressor vision of Israel. *Id.* at ¶¶ 35–37; *see also* Doc 99-17 ("Burns Report," detailing Hamas's use of media as a tool of propaganda and recruitment).

In addition to being an FTO dedicated to the globalization of Islam through violent holy war, Hamas also governs the Gaza Strip. SAC, ¶¶ 5, 11, 17. In that capacity, it controls virtually all civilian infrastructure in the Strip, including by maintaining and cultivating ties with and coordinating and directing the activities of well-placed Gazans. *Id.* at ¶ 5. Hamas's sociopolitical component works in tandem and support of Hamas's paramilitary arm, which together operate to achieve the FTO's violent objectives. *Id.* at ¶¶ 5, 31. Any party engaging Hamas is aware that any support redounds to the benefit of the entire criminal, terrorist enterprise, regardless of whether the assistance was ostensibly toward non-violent activities. *Id.* at ¶ 32. Those who knowingly choose to employ and compensate Hamas affiliates, like the AP, facilitate the aims of and assist the FTO, irrespective of the ostensible purpose of the employment. *Id.* at ¶¶ 5, 32.

Hamas treats propaganda, especially broadcast and disseminated through legacy media with global reach, like the AP, as a critical and necessary tool for the FTO to achieve its aims. *Id.* at ¶¶ 37–38, 44–48, 60–61. Hamas's founding charter outlines the blueprint for achieving media dominance to garner support for its cause;

it describes the necessity for "media people" to "take part in the operation of awakening [the masses]." *Id.* at ¶¶ 45–47. The Hamas charter further states: "Jihad is not confined to the carrying of arms and the confrontation of the enemy. The effective word, the good article, the useful book, support and solidarity . . . all these are elements of the Jihad for Allah's sake." *Id.* at ¶ 47. The Hamas charter purports to present this strategy as the counter to the "control of the world media" that had been "bought" by Hamas's "enemies"—i.e., Israel and the Jews. *Id.* at ¶ 46.

**i. Hamas's Relationship with Defendant-Appellee, the Associated Press**

For years, Hamas has controlled what media outlets, including the AP, publish about its activities, in pursuit of its stated goal of pushing propaganda through world media channels as a necessary element of jihad. *Id.* at ¶ 38. AP chose to bear the risks and liabilities inherent in cooperating with an FTO, presumably to gain a competitive edge in a hot media landscape. The AP shared an office building in al-Jalaa Tower for 15 years with Hamas intelligence services, and Hamas had a direct hand in crafting the AP's reporting. *Id.* at ¶¶ 38, 61. Former AP Jerusalem bureau correspondent Matti Friedman blew the whistle on the AP's longstanding tacit agreement to serve as a critical part of Hamas's propaganda arm, stating:

> The only reason a press outfit like the AP has to open a bureau there is to cover Hamas, but it's never been interested in reporting on how the group stores missiles in homes, schools, and hospitals, or on how little of the money it receives from Tehran goes to building civilian infrastructure or responsible governance. That's because the only story Hamas wants coming out of Gaza is about the fundamental evil of the

> Zionist entity. Through direct threats as well as fixers and minders appointed to steer journalists in the right direction, ***Hamas lets every press outfit and journalist in Gaza know that if they do not understand this fundamental angle, they are not welcome in Gaza***. A reporter's life may even depend on understanding those red lines.

*Id.* at ¶ 38 (emphasis added).

In at least one instance, "[Friedman] was informed by the bureau's senior editors that our Palestinian reporter in Gaza couldn't possibly provide critical coverage of Hamas because doing so would put him in danger." *Id.* Friedman also explained the AP would tailor its Gaza coverage to ensure it was Hamas-approved:

> Any veteran of the press corps here knows the intimidation is real, and I saw it in action myself as an editor on the AP news desk. During the 2008-2009 Gaza fighting I personally erased a key detail—that Hamas fighters were dressed as civilians and being counted as civilians in the death toll—because of a threat to our reporter in Gaza. (The policy was then, and remains, not to inform readers that the story is censored unless the censorship is Israeli. Earlier this month, the AP's Jerusalem news editor reported and submitted a story on Hamas intimidation; the story was shunted into deep freeze by his superiors and has not been published.).

*Id.* at ¶ 62.

### ii. The AP Knowingly Assigned and Paid Hamas Affiliates

Despite—or perhaps, because of—their known and/or easily ascertainable affiliation with Hamas, the AP fostered relationships with certain Gazan reporters and photojournalists (collectively "Hamas-affiliated journalists"). *Id.* at ¶¶ 49–63. The AP aided and abetted Hamas both by providing financial support to Hamas through payments made to its "journalists" and by lending its imprimatur of

credibility to Hamas terrorist propaganda produced by the Hamas-affiliated "journalists", hiding the "journalists'" affiliations with the FTO and falsely presenting them as neutral observers. *Id.* at ¶ 59.

The Hamas affiliation of one of these "journalists," Hassan Eslaiah[2] ("Eslaiah"), was known by the AP since at least 2018, and yet for the next five years, it continued to assign and pay Eslaiah and publish his photographs, including on October 7. *Id.* at ¶¶ 49–58, 72–94. In 2018, media watchdog the Committee for Accuracy in Middle East Reporting in America ("CAMERA") sent the AP a dossier exposing Eslaiah's extensive, and easily verifiable, ties with Hamas, including his work for an openly Hamas-affiliated news station. *Id.* at ¶¶ 49–58; Doc 139-1 at 2–3. On January 9, 2020, Eslaiah publicized his ongoing affiliation with Hamas, including his close relationship with Yahya Sinwar, the high-ranking Hamas official who then led Hamas in the Strip and masterminded October 7, with a photograph Eslaiah posted on social media depicting Sinwar embracing and kissing Eslaiah's cheek. SAC, ¶¶ 55–57.

Eslaiah stated "he contacted AP staff on October 7th when he heard something was happening at the fronteer [sic], and that AP staff told him to go there to take some picture [sic]." *Id.* at ¶ 53, Doc. 139-3 at 9–10. Having been sent by the AP, Eslaiah

[2] The spelling of Eslaiah's last name has also appeared in various documents as Islaih, Eslayeh, or Aslih.

was a joyous, gleeful participant in the Terror Attack, as he documented extensively across his social media. SAC, ¶¶ 69–90. Eslaiah infiltrated Israel not as so-called press, but to participate in a bacchanal of violence. *See id.* at ¶¶ 72–79, 86-90.

On the morning of the Terror Attack, approximately a half hour before it began, Eslaiah posted on his personal Telegram channel: "We wake up to the great gifts of God. The spirit has returned, and our blessings have increased." *Id.* at ¶ 72. About 30 minutes later, Eslaiah posted about the rockets Hamas had started firing on Israel, the Terror Attack's opening salvo; Eslaiah encouraged social media followers to join him as he shared the unfolding massacre. *Id.* at ¶¶ 40, 73. He plainly had foreknowledge of the attack.

Over the course of October 7, Eslaiah posted celebratory messages depicting Israel's growing nightmare. He shared photographs of himself "live from inside the settlements near the Gaza Strip," including burning tanks from surprise attacks on Israeli soldiers on the border and photographs of the massacre inside Kibbutz Kfar Aza. *Id.* at ¶¶ 74–76, 80, 92. Eslaiah posted a video, stamped with his personal watermark, of a room full of bloody corpses; he narrates, "[Animal] carcasses, carcasses. God is great. This is the path to Jerusalem." *Id.* at ¶¶ 82–83. He encouraged Gazan to come "grab and load" "trophies," i.e., Jews. *Id.* at ¶ 93. Eslaiah rode back into Gaza on the back of a motorbike equipped with a grenade. *Id.* at ¶ 85. Eslaiah is never seen wearing a press vest, helmet, flak jacket, or displaying press

credentials. *Id.* at ¶¶ 79, 86. He was not there as a journalist, but as a Hamas terrorist. *See generally id.* at ¶¶ 74–95.

Other Gazan photographers—including, Yousef Masoud, Ali Mahmud, Hatem Ali (collectively, with Eslaiah, "Terror Attack Participants")—were also embedded with Hamas during the Terror Attack. *Id.* at ¶¶ 49–90. Like Eslaiah, none are ever seen displaying press credentials or identification. *Id.* at ¶¶ 74–76, 79, 86. They produced photographs unobtainable by someone unaffiliated with Hamas. *Id.* at ¶¶ 77, 87, 95. In a scene where everyone who was not Hamas was being slaughtered, their photographs themselves—showing them standing safely shoulder-to-shoulder with Hamas—demonstrate their Hamas-affiliation. *Id.* at ¶¶ 95, 98

The AP knew no genuine, independent journalist could possibly enjoy real-time access to crimes against humanity unless he was acting for the benefit of and with the express endorsement of the FTO perpetuating those crimes. When the AP chose to pay for and publish the Terror Attack Participants' materials, AP knew they were paying Hamas affiliates. The Terror Attack Participants' role as Hamas propagandists was not a bug in AP's news reporting effort. It was a feature.

### C. The Associated Press's Knowingly Struck a Deal with the Devil

Years ago, AP chose to become a soldier in Hamas's propaganda wing. After Hamas took power in Gaza, news agencies had a decision to make between journalistic independence and integrity, or a continued presence in Gaza and

supporting the FTO's propaganda mission to delude the West into viewing terrorists as "freedom fighters" and their crimes as "resistance." *Id.* at ¶¶ 12, 37, 63–67, 94; Doc 99-17 (Burns Report, on Hamas's need for and use of western media to achieve its terror aims). AP voluntarily opted for the latter. Hamas's narrative is as vital to its jihad as is bloodshed, and it has long relied on the AP to play its part. SAC, ¶¶ 37–38, 44–48, 62. In return for acting as Hamas's beard in the media, the AP has received access to exclusive Hamas-curated "stories." Appellee has apparently decided the moral trade-off for aiding-and-abetting terrorists to get the scoop is worth it. *Id.* at ¶¶ 115–116. The law, however, disagrees.

Having chosen to prioritize access over independence in reporting, the AP knowingly accepted the Hamas-affiliation and terror activities of the Terror Attack Participants, paying them and publishing their "work." *Id.* at ¶¶ 102–107. Besides violating U.S. law, this constituted a breach of the AP's own guidelines, which require Appellee to vet sources and ensure all journalists and photographers, including freelancers, maintain "neutrality." *Id.* at ¶¶ 12, 63–67.

The October 7 photographs the AP commissioned, paid for, published, and credentialed illustrate Appellee's knowing decision to pay for and promote the work of literal terrorists in furtherance of terror propaganda. A non-terrorist journalist does not get the chance to photograph Jewish homes set aflame in Israel by terrorists. *Id.* at ¶ 84. Only a "journalist" affiliated with an FTO can take the notorious image of

the half-naked corpse of German-Israeli Shani Louk being stolen into Gaza by Hamas on the back of a pickup truck equipped with at least one rocket-propelled grenade launcher. *Id.*at ¶ 96. And when a media provider like AP pays for and publishes its freelancer's close-up, real-time photographs of Israeli civilians being beaten and kidnapped, it knows its "journalists'" are affiliated with the FTO committing those crimes. *Id.* at ¶¶ 98–100.

These photographs remained accessible on the AP's website as of Appellants' filing of the SAC (and some as of the date of this filing). To this very day, the mutually beneficial relationship between the AP and Hamas persists, wherein the former profits from the unique access to Hamas touted by its Hamas-affiliated "journalists" and Hamas benefits from both the compensation its affiliates receive from the AP and the AP's promulgation of Hamas's propaganda. *Id.* at ¶ 94.

As explained below, by knowingly choosing to pay known members of Hamas for work product produced as part of their active participation in the FTO's terror activities, the AP is liable for aiding-and-abetting the FTO's acts of terror. *Id.* at ¶¶ 45–47, 102–107.

## II. Procedural History

On February 21, 2024, Appellants filed their Complaint against Appellee asserting claims under the Federal Anti-Terrorism Act ("ATA"), as amended by the Justice Against Sponsors of Terrorism Act ("JASTA") and the Florida equivalent.

Doc 1. Judge K. Michael Moore was assigned to the case. Doc 2. Appellee was served on February 28, 2024. Doc 14. Appellee moved to dismiss the Complaint, Doc 29, which the Court denied as moot, Doc 43, given that Appellants had filed their Amended Complaint, Doc 40. Appellee filed a motion to dismiss the Amended Complaint, Doc 48, which the Court granted with leave for Appellants to amend, Doc 98.

On December 31, 2024, Appellants filed their Second Amended Complaint ("SAC"), Doc 99.[3] Appellants stated claims against the AP for (1) aiding and abetting Hamas in committing, planning, or authorizing acts of international terrorism, including acts that caused Appellants to be injured in his or her person and property, in violation of 18 U.S.C. §§ 2333(a), (d), SAC at ¶¶ 130–141; (2) knowingly providing material support for the commission of acts of terror, in violation of 18 U.S.C. § 2339A and 18 U.S.C. § 2333, *id.* at ¶¶ 142–156; (3) knowingly providing material support to Hamas, in violation of 18 U.S.C. §§ 2339B and 2333, *id.* at ¶¶ 157–163; and (4) facilitating and furthering terrorism, in violation of Fla. Stat. § 772.13(1), *id.* at ¶¶ 164–173. In support of their claims, Appellants cited, among other things, internal communications between AP personnel from documents produced by Appellee in discovery. Doc 85; Doc 94 at 4; Doc 139.

[3] The unredacted version of the SAC was filed under seal at Doc 105.

Appellee moved to dismiss on January 28, 2024, Doc 109 ("Motion"), Appellants opposed, Doc 121, and Appellee filed its reply. Doc 128. On September 29, 2025, the district court granted the motion to dismiss the SAC, dismissing with prejudice. Doc 154 ("Order"). On October 23, 2025, Appellants filed their Notice of Appeal. Doc 155.

Appellants limit this appeal to the district court's misapplication of the Rule 12(b)(6) requirements for adjudicating motions to dismiss, and to their claims concerning Count I of the SAC, namely the AP's aiding and abetting in violation of the ATA, as amended by JASTA, and the mirroring Florida state law.

**Standard of Review**

This Court reviews *de novo* an order granting a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, "accept[ing] as true the facts as set forth in the complaint and draw[ing] all reasonable inferences in the plaintiff's favor." *West v. Warden*, 869 F.3d 1289, 1296 (11th Cir. 2017) (internal citation omitted). A complaint must only be facially plausible to survive a motion to dismiss. *Caterpillar Fin. Servs. Corp. v. Venequip Mach. Sales Corp.*, 147 F.4th 1341, 1346–1347 (11th Cir. 2025) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (other citations omitted)).

The Court determines whether a complaint states a plausible claim, by "'draw[ing] on [its] judicial experience and common sense.'" *Id.* at 1347 (quoting

*Iqbal*, 556 U.S. at 679 (other citations omitted)). The plausibility standard is met where the plaintiff "'pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Id.* (quoting *Iqbal*, 556 U.S. at 678 (other citations omitted)). Importantly, plausibility "is not akin to a probability requirement." *Id.* (internal citations and quotations omitted). The standard "do[es] not require heightened fact pleading of specifics," nor does it require that the complaint "allege anything with particularity." *Id.* at 1348 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007) (other citations and quotations omitted)).

"A motion to dismiss *does not test the merits of a case,* but only requires that the plaintiff's factual allegations, when assumed to be true, 'must be enough to raise a right to relief above the speculative level.'" *Young Apts., Inc. v. Town of Jupiter*, 529 F.3d 1027, 1037 (11th Cir. 2008) (quoting *Twombly*, 550 U.S. at 127 (other citations omitted) (emphasis added)).

## Summary of the Argument

Appellants bring well-pled claims against Appellee, arguing for the application of the ATA, as amended by JASTA, and the Florida state equivalent, to the AP's aiding-and-abetting an act of international terrorism by Hamas, a designated FTO by the U.S. government.

Appellants now appeal the district court's Order, which improperly refused to credit Appellants' facts, which were pled to and far exceeded the notice standard required under Rule 8. Additionally, the court below improperly resolved specific factual disputes between the parties, and made inferences in favor of AP. Further, the district court violated this Court's bright-line rule prohibiting conversion of a motion to dismiss into a motion for summary judgment without notice. Each of these foundational errors requires reversal and remand.

Applying the correct standard, Appellants' allegations that the AP aided and abetted Hamas by providing material support through payment of and publication of photographs by Hamas-affiliated "journalists" are sufficient to state viable claims under the ATA, as amended by JASTA, and the Florida state equivalent. Put simply, the AP chose to assume a role in Gaza unlike anything resembling a traditional media source. It knowingly commissioned and compensated known Hamas affiliates and published their images taken from within the swirling turmoil of advancing terror violence. The AP should have known—and in one instance is already confirmed to have actually known—that only an FTO affiliate could stand so close to unfolding crimes against humanity without exposing themselves to harm.

For these reasons, Appellants respectfully request that this Court reverse and remand this action for further proceedings.

## Argument

### I. The District Court Committed Reversible Error in Misapplying the Motion to Dismiss Standard

The district court committed reversible error in granting Appellant's Rule 12(b)(6) motion to dismiss for failure to state a claim. *See, e.g.*, *Chaparro v. Carnival Corp.*, 693 F.3d 1333, 1337 (11th Cir. 2012). The Rule 8 pleading standard "does not require 'detailed factual allegations,'" but only something "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* (quoting *Iqbal,* 556 U.S. at 678 (citing *Twombly,* 550 U.S. at 555)). Appellants have easily cleared this bar, alleging facts "sufficient to raise a 'reasonable expectation' or 'render plausible'" its claims. *Adinolfe v. United Techs. Corp.*, 768 F.3d 1161, 1176 (11th Cir. 2014) (quoting *Twombly*, 550 U.S. at 570).

The district court misapplied the Rule 8 standard and misconstrued its duty when reviewing a motion to dismiss. Specifically, the court (i) failed to accept all Appellants' factual allegations as true and draw reasonable inferences in their favor, (ii) impermissibly resolved factual disputes in favor of Appellee, and (iii) improperly converted a motion to dismiss into a motion for summary judgment without notice.

#### A. The District Court Erred by Construing Facts Against Appellants and Resolving Factual Disputes in the AP's Favor

The district court was required to construe all factual allegations and make all reasonable inferences in favor of Appellants, yet it erroneously discredited or

expressly disbelieved Appellants' allegations. *See, e.g.*, Order at 9–12, 19, 21, 25. By improperly recasting the facts against Appellants and drawing inferences in the light most favorable to the AP, the court committed reversible error. *Renfroe v. Nationstar Mortgage, LLC*, 822 F.3d 1241, 1242 (11th Cir. 2016) (reversing and remanding because the district court had "improperly elevated [Defendant's] allegations over those of [Plaintiff] at the motion-to-dismiss stage").

The district court's errors can be traced to its refusal to accept as true two of Appellants' key allegations: *first*, the Terror Attack Participants were affiliated with the AP, and *second*, the AP knew the Terror Attack Participants were Hamas affiliates. Order at 9–12. Appellants' claims were thereafter doomed to fail. *See id.* at 28.

**i. The District Court Erred in Discrediting Appellants' Assertions Regarding the AP Affiliation of the Terror Attack Participants**

Appellants asserted specific facts, supported by documentation from AP's own internal communications, to support their allegation that the Gaza-based "journalists" were sufficiently affiliated with the AP to support ATA liability. SAC, ¶¶ 49–53; Doc 139-3. Examples of factual allegations on this front incorrectly rejected by the court include where [redacted] SAC, ¶ 50, and a lengthy WhatsApp message thread between AP personnel on November 9, 2023 wherein they discussed whether Terror

Attack Participants were assigned by the AP on October 7. Doc 139-3. Regarding whether Masoud was assigned, one AP employee states they must check with "[redacted]."[4] Doc 139-3 at 9–10. If Masoud was unaffiliated with the AP, the answer would have been a simple no.

Later, a member of the AP [redacted] warned colleagues: "[U]ntil Oct. 7 issue has been resolved we should not be using any images by [the Terror Attack Participants]"; a reasonable inference is these "journalists" were so regularly employed by the AP, an admonition to avoid assigning them was necessary. Doc 139-3 at 2. Moreover, one of the "journalists," Eslaiah, stated he entered Israel on October 7 at the AP's direction. SAC, ¶ 53, Doc. 139-3 at 9–10.

Despite Appellants' well-pled allegations, the district court held the Terror Attack Participants were not affiliated with the AP, improperly crediting Appellee's denials of Appellants' allegations, cherry-picking statements from the AP's internal communications, and making inferences in favor of Appellee. Order at 8–10. The court accepted the AP's assertion that it "was not aware of anyone within its organization assigning the Freelance Photographers to cover the October 7 Attack," despite Appellants' contrary allegations. *Id.* at 8–10, 13. The court even refused to credit Eslaiah's assertion that Appellee assigned him, holding statements from other AP personnel somehow "undercut" him. *Id.* at 10. The court further accepted

[4] [redacted]

Appellee's characterization of its relationship with Gazan-based "journalists" as "arm's-length" over Appellants' allegations. *Id.* at 20. By concluding the Terror Attack Participants were not affiliated with the AP, the district court committed reversible error. *Renfroe*, 822 F.3d at 1242.

**ii. The District Court Erred in Discrediting Appellants' Assertions Regarding the Hamas Affiliation of the Terror Attack Participants**

Appellants alleged the Terror Attack Participants "are known Hamas members," the affiliation was "open and notorious and easily ascertainable," Appellee had been told about the affiliation years earlier, and therefore the AP had the requisite knowledge of the FTO connection. SAC, ¶¶ 4, 54–57, 113. These allegations alone would suffice under Rule 8. But Appellants offered more, supporting these allegations with, among other things, the AP's own documents produced in discovery. *See* Docs 139-1, 139-2, 139-3. These documents showed the AP knew or at least suspected the Terror Attack Participants were Hamas affiliates.

In internal AP emails from 2018, Appellee's employees discuss a damning report documenting Eslaiah's extensive ties to Hamas sent to the AP by CAMERA, a media watchdog. Doc 139-1 at 2–3. [redacted] forwards the CAMERA report to AP [redacted] with the message, "They have sent an entire file on the journalist [Eslaiah] we quoted, saying he is from Hamas media. Is this stuff accurate?" *Id.* [redacted] responds, "The most important thing to me is that our reporting is accurate." *Id.* [redacted] replies, "But we [the AP] shouldn't describe

someone from al quds [sic] [i.e., Hamas-affiliated media] as being an independent journalist." SAC, ¶ 51. In a second email exchange the day the AP received the CAMERA report, [redacted] writes to [redacted] "[W]e [the AP] need to be careful. [redacted] describes this guy [Eslaiah] as independent and reliable. I'm not sure he's either." *Id.* at ¶ 52. Similarly, in a November 2023 WhatsApp message, a head of the AP's [redacted], writes one of the "journalist's" "social media is a mess," Doc 139-3 at 8; a reasonable inference is that Appellee was aware this "journalist's" terror-affiliations were public record. *Id.*

The AP was, therefore, on notice well in advance of the Terror Attack that its Gaza-based "journalists" were Hamas affiliated, but was willing to aid and abet an FTO's terror acts, because, as its own personnel internally admitted, Appellee's focus was on getting the story. SAC, ¶¶ 38, 51–59.

The district court erred in disbelieving Appellants' factual contentions that Appellee knew their Gaza-based "journalists" were Hamas affiliates, stating: "[T]he Court does not accept these allegations as true." Order at 10–14; *Adinolfe*, 768 F.3d at 1176; *Renfroe*, 822 F.3d at 1242. Instead, the court chose to credit the AP's denials of its awareness, then selectively quoted and cited Appellee's documents and made painstaking inferences to find support for this position. Order at 13–14, n.5. In one instance, the district court pointed to the AP's irrelevant "corroboration" of Eslaiah's "reporting" as justifying the AP's reliance on Hamas affiliates. *Id.* at 13 n.5. The fact

that FTO-affiliates' so-called reporting was, in certain instances, proven to be accurate, is immaterial to Appellants' contention that Appellee knowingly provided material support to an FTO.

The district court committed reversible error in rejecting Appellants' allegations of the Terror Attack Participants' affiliations with Appellee and Hamas. In *Nunez v. J.P. Morgan Chase Bank, N.A.*, 648 F. App'x 905 (11th Cir. 2016), the Court found reversible error where the district court had repeatedly construed facts in the defendant's favor, including "relying on unsupported inferences about [the defendant's] intentions and versions of the facts that contradict the allegations in [the plaintiff's] amended complaint." *Id.* at 909. The district court had improperly found the defendant, a loan servicer, "did the best it could" when confronted with a claim of mishandling a mortgage. *Id.* at 909–910. In reversing, the Court held such "conclusions were not proper in deciding Rule 12(b)(6) motions." *Id.* at 910. Here, too, the lower court consistently applied the opposite of the Rule 12(b)(6) standard, construing and making inferences in favor of the AP, rather than Appellants.

Moreover, the court below failed to take a comprehensive approach when evaluating Appellants' claims, rejecting assertions in isolation as insufficient. This method was rejected in *Adinolfe v. United Technologies Corporation*, where this Court found error where the lower court had isolated each of Appellants' facts, finding each in turn insufficient, ignoring the cumulative effect, and thus finding

them wanting. 768 F.3d at 1172–1173. The *Adinolfe* Court reversed because the district court improperly "discounted the aggregate plausibility of the plaintiffs' allegations"; though an "allegation may appear conclusory when read in isolation," the weight of the factual allegations taken together may be sufficient to "easily push . . . plaintiffs' claims across the line from conceivable to plausible." *Id.* at 1172 (internal citation omitted). The Court explained factual assertions must be "taken in tandem" to determine whether they are sufficient to "raise a right to relief above the speculative level." *Id.* at 1173 (quoting *Twombly*, 550 U.S. at 570).

Similarly, in *Renfroe v. Nationstar Mortgage, LLC*, 822 F.3d 1241 (11th Cir. 2016), the Court reversed the district court's dismissal as it had improperly accepted as true the defendant's "own conclusions . . . over [plaintiff's] allegations." *Id.* at 1245. The *Renfroe* Court characterized granting a motion under such circumstances as "dangerous" as it "turns the standard for considering a [Rule] 12(b)(6) motion on its head." *Id.* The Court must reverse for the same reasons in this instance.

Moreover, "in adjudicating a motion to dismiss, the district court may not resolve factual disputes." *Page v. Postmaster Gen. & Chief Exec. Officer of the U.S. Postal Serv.*, 493 F. App'x 994, 995, 998 (11th Cir. 2012) (finding "the dismissal cannot be allowed to stand on the present record" (internal quotations and citations omitted)). Here, the court adjudicated specific disputes over whether the AP knew (i) its "journalists" were affiliated with Hamas, and (ii) it shared offices with Hamas.

*See* Order at 12, 14, 19. The court was obligated to give no credence to the AP's position on these disputes at the dismissal stage, and to exclusively accept and adopt Appellants' well-pled view. *Adinolfe*, 768 F.3d at 1173 (finding the lower court erred when it considered that defendant "contests the accuracy of a number of the factual allegations that the plaintiffs have pled"). Instead, the court did the opposite, finding Appellants' facts unconvincing in light of Appellee's self-serving contrary assertions. Order at 12.

In one particularly egregious example, the district court declined to credit the Matti Friedman materials cited by Appellants, wherein one of the AP's own Israel reporters stated Appellee knowingly shared a building with Hamas and empowered Hamas with editorial control over its publication decisions, *see* SAC, ¶¶ 38, 62, based solely on the fact that "the AP has publicly and strenuously disputed the contention[.]" Order at 12. In another instance, the court pit Appellants' description of the Hamas-affiliated "journalists" against "the AP's characterization," and specifically credited the AP's view. *Id.* at 14.

Appellee disputing these allegations was entirely irrelevant at the dismissal stage. The district court's error in engaging in resolution of factual disputes favorable to Appellee proffers yet another basis for reversal. *Roberts v. Carnival Corp.*, 824 Fed. Appx. 825, 828–829 (11th Cir. 2020) (reversing where the district

court resolved a factual argument in favor of the defendant); *Turner v. Burnside*, 541 F.3d 1077, 1086 (11th Cir. 2008).

### iii. The District Court's Error Comprehensively Infected its Evaluation of Appellants' Claim for Intermediary Liability

The district court compounded its error of discrediting Appellants' well-pled facts to find that Appellants could not prove intermediary liability under the ATA, and the coextensive state law. In dismissing Count I of the SAC, the court improperly construed the facts against Appellants to find they could not prove the AP's "general awareness of its assuming a role in Hamas's terrorism or that the AP knowingly and substantially assisted the October 7 Attack." Order at 21. The court rejected Appellants' fundamental factual allegations only to find Appellants' rewritten allegations insufficient.

The court found general awareness inadequately alleged because it had previously concluded the Terror Attack Participants "should not be construed as members of the AP." Order at 10–14. The court subsequently relied on this erroneous conclusion to find Appellants had insufficiently pled substantial assistance. *Id.* at 16–19. In rejecting allegations regarding knowing assistance, the court then tautologically relied on its improper finding that the AP did not know of its links to an FTO to conclude that the AP did not know. *Id.* at 16. The court framed these conclusions as legal determinations, when they were inherently instances of the court's own flawed fact-finding. *See E.E.O.C. v. Ready Mix USA*, No. 2:09-CV-

923-MEF-TFM, 2010 WL 3398991, at *5–6 (M.D. Ala. Aug. 26, 2010) (explaining that defendant "show[ed] a misunderstanding of what it is to be a 'legal conclusion'" and that "[u]nfortunately for [defendant], these 'conclusions' are supported by the previous paragraphs in the . . . complaint").

In another error requiring reversal, the district court waved away allegations as "conclusory," without identifying which specific facts it was treating as conclusory. *See, e.g.*, Order at 11, 19–20, 25–26 ("Much of these allegations, however, are conclusory rather than specific, factual allegations," *id.* at 11; "[S]ome of the underlying allegations are conclusory . . . '" *id.* at 19–20). But, as this Court held in *Chaparro v. Carnival Corporation*, the district court is not empowered to ignore plaintiffs' allegations, label them "conclusory rather than factual, and thus," find that "the pleading failed to satisfy the requirements." 693 F.3d at 1335–1337; *see also Armstrong v. Floyd Cnty.*, No. 4:13-CV-0050-HLM, 2013 WL 8711442, at *4 (N.D. Ga. Dec. 3, 2013) (demonstrating how the court must specifically identify which allegations it is rejecting as "conclusory").

Moreover, what the court seemed to reject as "conclusory," were well-pled allegations, including Appellee's awareness of Hamas's manipulative use of the media, generally, and of the AP specifically to support its terror activities. SAC, ¶¶ 6, 38, 62. In *Adinolfe*, the Court advised that "[i]n the absence of a developed factual record, or undisputed matters which can be judicially noticed, a district court

is not equipped to make plausibility determinations on complex [] issues." 768 F.3d at 1175. In *Adinolfe*, it was scientific issues involving aquifers, water flow, and water contamination. *Id.* Here, it is the complex relationship between the AP and an FTO. The district court's perspective that "other explanations . . . exist" for Appellants' assertions, did not render them "implausible." *Id.*

It is not the province of the district court to ignore well-pled allegations and reasonable inferences therefrom, even if the court considers them "inflammatory." Order at 10 n.4. *See Warren v. DeSantis*, 631 F. Supp. 3d 1188, 1194 (N.D. Fla. 2022) ("Credibility choices play no part in the analysis; a motion to dismiss is not the vehicle by which the truth of a plaintiff's factual allegations can be judged."); *Vernon v. Med. Mgmt. Assocs., Inc.*, 912 F. Supp. 1549, 1556–1557 (S.D. Fla. 1996) (treating even "offensive" content in "well-pleaded allegations . . . as true" in denying dismissal); *see generally Chaparro*, 693 F.3d at 1337; *cf. United States ex rel. Sedona Partners LLC v. Able Moving & Storage Inc.*, 146 F.4th 1032, 1044–1445 (11th Cir. 2025) (reversing striking allegations from a pleading, as Rule 12(f) is a "drastic remedy" intended for only very limited use).

In sum, the district court imposed a pleading standard contradicting Rule 8 and failed to adhere to the mandatory Rule 12(b)(6) requirement to credit all Appellants' well-pled factual assertions. This Court held in *Speaker v. U.S. Department of Health & Human Services Centers for Disease Control & Prevention*,

623 F.3d 1371, 1386 (11th Cir. 2010), a plaintiff "need not prove his case on the pleadings—his Amended Complaint must merely provide enough factual material to raise a reasonable inference, and thus a plausible claim." As in *Speaker*, Appellants met their burden, and the district court erred in granting Appellee's motion to dismiss.

### B. The District Court Impermissibly Considered Extrinsic Evidence Without Converting the Motion to Dismiss

Where the district court considers extrinsic evidence during a Rule 12(b)(6) proceeding, the judge is obligated to comply with the Rule 56 notice requirements, alerting the parties that it is converting the motion to dismiss into one for summary judgment and providing ten days for the opposing party to respond. *Jones v. Auto. Ins. Co.*, 917 F.2d 1528, 1531–1532 (11th Cir. 1990). This Court enforces a "bright-line rule: If a district court fails to comply with the ten-day notice requirement, the case will be reversed and remanded so that the district court may provide the non-moving party with adequate notice." *Id.* at 1532. Because the court below converted the AP's motion to dismiss without providing Appellants' proper notice and a reasonable opportunity to respond, it committed reversible error. *Id.*

***First***, the district court decided the Terror Attack Participants were not affiliated with the AP largely based on "[t]he structure of payment after receipt of photographs, which is typical to freelance arrangements and applicable here." Order at 9. But this assertion was not pled anywhere by Appellants; rather, it seems to be

an assumption the court independently generated, as evidenced by the lack of citation to any pleading or document on the record. Far from being supported by the SAC, this assertion is directly contradicted by Appellants, who pled: "Despite knowledge of the Hamas-Affiliated 'Journalists'' connections with Hamas, *for years AP has paid and continues to pay* the Hamas-Affiliated 'Journalists' for their photographs and videos. These payments are a direct funding source for Hamas." SAC, ¶ 63 (emphasis added). The court's error was not harmless, as it relied on these self-generated "facts" to hold that Appellants could not prove general awareness because the "timing is problematic." Order at 14.

***Second***, in assessing duration of assistance under the *Halberstam* test, the district court wrote that it sought to "substantively assess" Appellants' contentions regarding Appellee's years-long enmeshment with Hamas and found them wanting. Order at 20–21. Such analysis, again, is exclusively the purview of summary judgment proceedings, as "the Court cannot *weigh the evidence* on a motion to dismiss." *Drexler v. Trans Union, LLC*, No. 8:20-CV-2366-30JSS, 2020 WL 8299761, at *2 (M.D. Fla. Dec. 15, 2020) (emphasis added).

As the district court considered materials beyond the face of the complaint and attached documents, and drew factual conclusions from them, Rule 12(d) required notice and an opportunity to respond before summary judgment could be entered. *See Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1261 (11th Cir. 2006);

*Jones*, 917 F.2d at 1529–1530. Appellants received no such notice or opportunity, rendering the dismissal reversible error. *Poulsen v. Publix Super Markets, Inc.*, 302 F. App'x 906, 908 (11th Cir. 2008).

## II. The SAC Plausibly Alleged Secondary Liability Under the ATA, and therefore the District Court's Dismissal of Count I Should be Reversed

The District Court incorrectly determined that Appellants failed to plausibly plead an aiding-and-abetting claim under Section 2333 of the ATA, and the coextensive claim under Fla. Stat. §§ 772.13(1). Order at 7–21. The allegations of material support are straightforward: the AP knowingly employed Hamas affiliates, and, in the case of Hassan Eslaiah, Appellee knowingly employed and continued to regularly pay him despite confirmed knowledge of his Hamas affiliation for at least five years prior to his participation in October 7. SAC, ¶¶ 40–94.

The AP knew the Terror Attack Participants were Hamas affiliates, and any contention to the contrary doesn't pass the smell test. Appellee cannot seriously claim that it believed "journalists" with such access to Hamas could be anything but under the FTO's control. Indeed, years ago, AP employees expressed concern internally over Eslaiah's known ties to Hamas, but Appellee opted to continue to employ Eslaiah, which included commissioning him to photograph *his very involvement* in the Terror Attack. *Id.* at ¶¶ 50–54, 71–85, 91–94. For the reasons detailed below, these allegations more than satisfy the pleading standards of the ATA.

### A. The ATA Provides for Broad Relief and Two Frameworks for Evaluating ATA Claims

In 1992, Congress passed the ATA to provide a private cause of action to U.S. nationals who are victims of international terror. A 2016 amendment to the ATA, the Justice Against Sponsors of Terrorism Act ("JASTA"), established an avenue for victims to pursue justice against those who aid and abet terrorists. With JASTA, Congress intended to provide litigants "the broadest possible basis" of relief against entities that have "provided material support, directly or indirectly, to foreign organizations or persons that engage in terrorist activities against the United States." Pub. L. No. 114-222, 130 Stat. 852, 853 (Sept. 28, 2016). In keeping with its intended purpose, JASTA's aiding-and-abetting provision allows plaintiffs who have suffered an "injury arising from an act of international terrorism committed, planned, or authorized by an organization that had been designated as a foreign terrorist organization" to file suit against "any person who aids and abets, by knowingly providing substantial assistance." 18 U.S.C. § 2333(d)(2). Aiding-and-abetting liability is supposed to "reach[] persons who do not engage in the proscribed activities at all, but who give a degree of aid to those who do." *Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 176 (1994).

A plaintiff bringing an aiding-and-abetting claim under Section 2333 must show (1) he possesses an injury caused by an act of international terrorism; (2) the act was carried out by an FTO, as designated by the U.S. State Department; and (3)

the defendant aided and abetted the FTO "by knowingly providing substantial assistance." *See* 18 U.S.C. §§ 2333(a), 2333(d)(2). Appellee does not dispute that the first two factors have been satisfied by Appellants and instead asserts that the third factor—"knowingly providing substantial assistance"—has not been met. Doc 109 at 9–18.

The courts have two primary mechanisms at their disposal for assessing whether a defendant has "knowingly provided substantial assistance" to an FTO. First, when passing JASTA, Congress incorporated the "legal framework" of the D.C. Circuit case *Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983). JASTA, § 2(a)(5). That "framework" consists of a three-part test, as put forth in *Halberstam*: (1) "the party [] the defendant aids must perform a wrongful act that causes an injury"; (2) the defendant "must be generally aware of his role as part of an overall illegal or tortious activity at the time he provides the assistance"; and (3) the defendant must "knowingly and substantially assist the principal violation." *Halberstam*, 705 F.2d at 477. The *Halberstam* Court went on to provide a variety of factors that might be considered when assessing whether the third element of the test had been satisfied, such as "the nature of the act assisted"; the "amount of assistance" provided; whether the defendant was "present at the time" of the principal tort; the defendant's "relation to the tortious actor"; the "defendant's state of mind"; and the

"duration of the assistance" provided. *Halberstam*, 705 F.2d at 488. As will be described below, Appellants satisfied the *Halberstam* criteria.

But even the *Halberstam* framework does not represent the totality of the analysis. The Supreme Court in *Twitter, Inc. v. Taamneh*, 598 U.S. 471 (2023) concluded that "those elements and factors [in *Halberstam*] should not be taken as inflexible codes; rather, they should be understood in light of the common law and applied as a framework designed to hold defendants liable when they *consciously and culpably 'participate[d] in' a tortious act in such a way as to help 'make it succeed.'*" *Id.* at 497 (quoting *Nye & Nissen*, 336 U.S. 613, 619 (1949) (emphasis added)). The *Twitter* Court further underscored that a plaintiff must show a "concrete nexus" between the support provided by a defendant and the act of terrorism at issue unless a defendant "so systemically and pervasively assisted [the FTO] that defendant[] could be said to aid and abet every single [FTO] attack." *Id.* at 501.

Here, the district court held that Appellants failed to satisfy the last two prongs of the *Halberstam* test—namely, that they failed to show the AP was "generally aware" of its role in overall tortious activity and that it provided "knowing and substantial assistance" to the FTO in its commission of the terror attack. Order at 7–

21. On both accounts, the court was incorrect, and its decision ought to be overturned.[5]

Put simply, the publicizing of images and videos taken from within the scene of the Terror Attack was an integral part of Hamas's terroristic strategy. That strategy could not have been effectuated without the AP paying so-called "journalists" to enter a scene that would be fatal to any freelancer genuinely independent of Hamas, and then publishing images that only members of Hamas or their affiliates would have been permitted to record.

**B. The District Court Erroneously Held that Appellants Failed to Plead "General Awareness"**

To plead "general awareness," Appellants must show "the defendant [was] generally aware of his role as part of an overall illegal or tortious activity at the time he provide[d] the assistance." *Halberstam*, 705 F.2d at 477. Aiding-and-abetting liability applies not only to those who provide material support directly to an FTO but also to those who do so *indirectly* through an intermediary, such as an FTO-linked individual. *See, e.g.*, *Kaplan v. Lebanese Canadian Bank, SAL*, 999 F.3d 842, 862 (2d Cir. 2021) (finding bank's financial services to Hezbollah-linked clients—like enabling wire transfers, sanction circumvention, and offering "special

[5] That Appellants satisfied *Halberstam*'s first prong—i.e., Hamas committed a "wrongful act"—was uncontested. Doc 109 at 8–9, Order at 8–21.

exceptions”—can constitute material support to an FTO, even if passed through intermediaries).

When evaluating intermediary liability in the ATA context, courts are to apply a two-part test to evaluate the strength of the connection between the defendant, the intermediary, and the FTO. That is, the “generally aware” prong is satisfied if “(1) the defendant was aware of the intermediary’s connection to the terrorist organization, and (2) the intermediary is ‘so closely intertwined’ with the terrorist organization’s illegal activities as to give rise to an inference that the defendant was generally aware of its role in the organization’s terrorist activities.” *Bernhardt v. Islamic Rep. of Iran*, 47 F.4th 856, 867–868 (D.C. Cir. 2022) (quoting *Honickman v. BLOM Bank SAL*, 6 F.4th 487, 501 (2d Cir. 2021)).

### C. The District Court Did Not Apply the Proper Test for Intermediary Liability under the ATA

Despite this well-tread test for intermediary liability, the district court did not apply it. In fact, nowhere in the Order is there a mention of intermediary liability. Instead, the district court seems to stress (erroneously) the Terror Attack Participants needed to be salaried, full-time employees of the AP for Appellee to be held liable for their conduct. Order at 8–9. The court also stated that it did not regard a standard practice of remunerating the “journalists” for their work to sufficiently demonstrate effective employment by the AP, thereby further absolving Appellee of liability. *Id.* at 9. The court cites no legal basis for these propositions, and indeed, none exists.

In its Order, the court below further upheld its previous finding that "[a]bsent any allegation or theory that the [Terror Attack Participants] were actively working for the AP at the time of the October 7 Attack, the Court cannot conclude, nor do Plaintiffs provide any clarification, that the Court should consider the [Terror Attack Participants] as a part of the AP for purposes of the claims set forth in the Amended Complaint." *Id.* (quoting Doc 98 at 9). As discussed above in Section I.A.i, the district court's conclusion that the Terror Attack Participants were not affiliated with the AP was clear error.

At one point, the district court stated, "there is no support for the contention that the [Terror Attack Participants'] possible aiding and abetting *ipso facto* becomes the AP's aiding and abetting." Order at 18. But this is not the test to be applied. This interpretation is a fundamental misreading of aiding-and-abetting liability under the ATA insofar as the intermediary's employment status is irrelevant; the parties are not required to become one and the same. Rather, what matters for the purposes of evaluating ATA liability is the Terror Attack Participants' relative *closeness* to *Hamas* and the AP's awareness of such.

To that point, the district court does not cite a single case under the ATA for its proposition that an intermediary providing support to an FTO must be an *employee* of the intermediary for material support to be in violation of the ATA. *Id.* at 8–9. That is because no such case exists. In fact, frequently the intermediary is

simply a customer of the defendant, as where banks have been sued for conducting transactions for FTO-linked individuals. *See, e.g.*, *Kaplan v. Lebanese Canadian Bank, SAL*, 999 F.3d 842, 862 (2d Cir. 2021) (finding bank could be held liable for providing material support to Hezbollah by providing financial services to Hezbollah-linked clients); *Miller v. Arab Bank, PLC*, 372 F. Supp. 3d 33, 45 (E.D.N.Y. 2019) (finding bank could be held liable for providing material support to Hamas by providing financial services to Hamas leaders and affiliates).

Intermediary liability was born from the very concept that there exist more incidental relationships that are nevertheless pernicious when an FTO is involved. For that reason, there is no indication that the relationship between a defendant and its intermediary must be a formal employer-employee relationship for the defendant to be held liable for providing support to an FTO through the intermediary.

Appellants' description of the relationship between the AP and the Terror Attack Participants, especially Eslaiah, far exceeds the necessary threshold to demonstrate a proper connection between a defendant and its intermediary. In contrast to an FTO-linked customer that happens to bank at a facility with millions of customers, here Appellants presented the district court with specific FTO affiliates who participated in one of history's most prolific terror attacks, some of whom worked for the AP for *years*. *See generally* SAC, ¶¶ 50–94.

### D. The AP Was Aware of the Terrorist Participants' Ties to Hamas

Pleading awareness in the JASTA context does not—and simply cannot—require a high degree of specificity. Rather, "[b]ecause there is rarely direct evidence of a defendant's mental state, the fact finder often must draw inferences from circumstantial evidence." *Bernhardt*, 47 F.4th at 867. In other words, a complaint need only contain "general allegations as to a defendant's knowledge," because "a plaintiff realistically cannot be expected to plead a defendant's actual state of mind." *Kaplan*, 999 F.3d at 864 (internal quotations and citations omitted).

Appellants have more than met this standard here by showing not only a long, broad history of relations between Hamas and the AP, but also Eslaiah's own public postings indicating his close ties to Hamas and internal documents reflecting AP concerns regarding Eslaiah's Hamas connections dating back five years.

Appellants have properly pled that Appellee was placed on notice of Eslaiah's connections to Hamas, given CAMERA's 2018 dossier alerting the AP to (1) Eslaiah's affiliation with Hamas, (2) his glorification of terrorism, (3) his calls for violence, (4) his celebration of murder, and (5) his work for a Hamas-affiliated newspaper. SAC, ¶¶ 51–52, 58; Doc 139-1, Doc 139-2. In internal emails, AP [redacted] expressed skepticism at Eslaiah's status as "independent," the inverse, of course being that he was affiliated with the Hamas-run government of Gaza. SAC, ¶¶ 51–52. [redacted] warned his own colleagues of

Eslaiah, stating, "I still think we need to be careful [with Eslaiah]. [redacted] describes this guy as independent and reliable. I'm not sure he is either." *Id*. at ¶ 52. Doc 139-2.

The AP's concerns over Eslaiah were well-founded, though seemingly never subjected to even a cursory investigation. Eslaiah did not hide his relationship to Hamas. Almost four years prior to October 7, Eslaiah took what appears to be a "selfie" with Yahya Sinwar, the mastermind of the Terror Attack, with Sinwar kissing his cheek and Eslaiah beaming. SAC, ¶ 56. The photo was so readily accessible to the public (and, therefore, to Appellee) that a non-governmental organization, Honest Reporting, managed to publish it just days after October 7. *Id*. at ¶ 57.

The AP's attempts at feigning ignorance of its "journalists'" affiliation with Hamas are as unconvincing as they are premature at the pleading stage. *See Halberstam*, 705 F.2d at 486 ("As to the inference of Hamilton's knowledge of Welch's criminal doings, it defies credulity that Hamilton did not know that something illegal was afoot."). Pursuant to the AP's own guidelines, it vets its sources and enforces its policy of "strict neutrality," and will dismiss journalists and photographers—including freelancers—for violations of the same. SAC, ¶¶ 12, 63-67.

Hamas has, for over a decade, controlled the AP's coverage of Hamas. This relationship was facilitated by the fact that the AP and Hamas shared an office building for 15 years, as Hamas assumed a prominent role in crafting the AP's reporting in Israel and the Palestinian territories. *Id.* at ¶ 38. As former AP reporter Matti Friedman has publicly stated, "I was informed by the bureau's senior editors that our Palestinian reporter in Gaza couldn't possibly provide critical coverage of Hamas because doing so would put him in danger." *Id.* The AP's coverage of Hamas was driven by what Hamas desired and intended to print, with the FTO "killing" unflattering stories. *Id.* at ¶ 62. In exchange for access, the AP functioned as Hamas's propaganda artist in the West for years, laundering Hamas's terrorist actions when Hamas wanted to create a veneer of respectability, before advertising Hamas's viciousness on October 7 when doing so served Hamas's jihadist strategy. Under these circumstances, the court was not permitted to conclude that the AP did not know the Terror Attacks Participants were Hamas affiliates.

The more plausible scenario—and the one specifically pled here by Appellants—is that the AP had an awareness of its "journalists'" ties to Hamas, but chose to ignore Hamas's influence, as it had done so many times in the past. Appellee's pattern of behavior speaks to the larger issue of the AP's undisturbed, and even welcoming approach toward Hamas seizing control of its local reporting.

### E. The Terror Attack Participants' Notorious Intertwinement with Hamas Supports the AP's "General Awareness" of FTO Support

The intertwinement between the Terror Attack Participants and Hamas was so open and notorious as to make Appellee aware that providing *any* assistance to them, whether in the form of remuneration or even just publishing their photographs—especially without acknowledging that they were taken by members of Hamas and not by neutral journalists—would be to the benefit of Hamas. *See, e.g.*, *Jan et al. v. People Media Project*, 783 F. Supp. 3d 1300, 1306–1307 (W.D. Wash. 2025) ("Even though [Israeli hostage] Jan did not allege specific amounts of money [from Palestine Chronicle] . . . the timing and extent of Aljamal's employment support[s] the reasonable inference that the payments provided assistance with substantial effect on Jan's captivity.").

Again, Appellee knew Eslaiah was a Hamas affiliate for over five years; he then trumpeted his foreknowledge of the Terror Attack, was directed by the AP to go photograph it, participated in the Terror Attack, and was paid by the AP for doing so. SAC, ¶¶ 72–75, 88–101. Eslaiah's participation in Hamas's largest-ever terror attack was to be expected, *especially if the AP was ordering him to photograph the Attack* knowing all the while who he was. Moreover, other "journalists" had social media that was known by Appellee to be a "mess" and access to Hamas that should at the very least have raised serious alarm, and yet all were rewarded for their participation in the Terror Attack. *Id.* at ¶¶ 49–101; Doc 139-3.

As in *Halberstam*, as soon as the AP agreed to participate in an "unlawful course of action"—namely, continuing to employ the services of a Hamas affiliate—Appellee rendered itself liable for the "reasonably foreseeable consequence[s] of the scheme," which includes acts of terror. *Halberstam*, 705 F.2d at 487.

And the degree of intertwinement between Eslaiah and Hamas could not have been blunter. On the morning of October 7, just before 6:00 AM and *before a single rocket had been fired or Israel's borders breached*, Eslaiah proudly declared on his personal Telegram channel: "We wake up to the great gifts of God. The spirit has returned, and our blessings have increased." SAC, ¶ 72. The timing of Eslaiah's post strongly suggests he enjoyed foreknowledge of the day that would become the deadliest to Jews since the Holocaust. Shortly after posting his message, he encouraged followers to embark alongside him as he invaded Israel. *Id.* at ¶¶ 40, 73. Throughout the morning, he gleefully documented himself and others engaging in atrocities, posting photographs of himself participating in the invasion of Kibbutz Kfar Aza as the homes of Israelis, with many still inside, burned to the ground around him. *Id.* at ¶¶ 74–76, 80, 92. Hamas used Eslaiah at least in part because of the credibility his AP credentials lent Hamas's atrocities. *See id.* at ¶¶ 70, 77, 81, 87.

Lest anyone suggest Eslaiah was merely documenting what he witnessed, the AP photographer posted euphoric messages celebrating the mass murder of Jews, including a video of a room full of bloody corpses, with Eslaiah's voice in the

background saying, "[Animal] carcasses, carcasses. God is great. This is the path to Jerusalem." The video was marked with Eslaiah's watermark, "Filmed by Hassan Eslaiah." *Id.* at ¶¶ 82–83. In another video, he celebrated the "trophies"—the Jews—that Gazans could come "grab and load." *Id.* at ¶ 93. At one point, Eslaiah can be seen riding on a motorbike with Hamas equipped with what appears to be a grenade. *Id.* at ¶ 85. It is unclear what journalistic purposes a grenade might have.

The "public record" here could not be clearer. The Terror Attack Participants' photographs, which the AP commissioned and which remained online as of the filing of the SAC, provide photographic evidence of their participation. Instead of alerting authorities to the developing massacre, or in the very least, *refraining from publishing the photographs and refusing to pay participants in terror*, the AP opted to send "journalists" to participate in the carnage, published the resultant photographs as "exclusive," and compensated the Hamas affiliates for their so-called "work." *Id.* at ¶ 10. In short, Appellee knowingly directed Hamas affiliates to photograph the Terror Attack that harmed Appellants, and then paid them for their trouble. *Cf. Honickman v. BLOM Bank SAL*, 6 F.4th 487, 502 (2d Cir. 2021) (finding that Defendants could not have known the "true nature and activities [of the FTO] from the public record at the time").

### F. The District Court Erroneously Held that Appellants Failed to Plead "Knowing and Substantial Assistance"

The district court found that "Plaintiffs have [not] shown the AP had a culpable state of mind towards assisting Hamas due to its lack of knowledge thereof" insofar as Appellants insufficiently plead allegations demonstrating the AP's prior knowledge of the Terror Attack Participants' Hamas affiliation. Order at 16. For the aforementioned reasons, the lower court is incorrect. The SAC alleges that the AP knew Eslaiah specifically was a member of Hamas prior to the Terror Attack. *See* SAC, ¶¶ 8–10, 14–15, 50–59, 63, 102. It also alleges the AP knew Eslaiah was unlawfully in Israel on October 7, perpetrating terrorist activities—because he invaded Israel, at least in part, *at the AP's direction*. *See id*. at ¶¶ 8–10, 14–15, 51–55, 58–59, 63, 68–91, 95–107. The SAC also alleged the AP knew, or should have known, of the terror affiliations of its other "journalists." SAC ¶¶ 49–90.

The district court also determined Appellants "do not allege in any specificity what those relationships [between the Terror Attack Participants and Hamas] consisted of or why they would have been so known." Doc 154 at 16. Interestingly, the district court cites no case law for the proposition that the comprehensive specifics of the Terror Attack Participants' relationship with Hamas must be identified at the pleading stage. It should be sufficient to plead the "journalists" had access to Hamas only possibly garnered through close ties with the FTO. And far more than that was pled. Eslaiah had a known long-standing relationship with Hamas

leadership's highest echelons; was employed by a confirmed Hamas media mouthpiece; indicated advance knowledge of the Terror Attack; and personally participated in the attack. All the Terror Attack Participants' direct involvement in the *actual* attack that harmed Appellants exceeds the involvement often seen from intermediaries in analogous ATA cases. *See, e.g.*, *Miller v. Arab Bank, PLC,* 372 F. Supp. 3d 33 (E.D.N.Y. 2019); *Boim v. Holy Land Found. for Relief & Dev.*, 549 F.3d 685, 694 (7th Cir. 2008); *Jan*, 783 F. Supp. 3d at 1306–1307 (ATS equivalent).

Prior to conducting its evaluation of the "knowing and substantial assistance" prong, the district court insisted Appellants must show the FTO actually received the funds because Appellants fail to plead "general awareness." Doc 154 at 18. Appellants reject this contention because Appellee's general awareness *has* been properly pled, as described herein.

### G. Plaintiffs' Allegations Satisfy the *Halberstam* Element of Knowingly Providing Substantial Assistance to Hamas

Under *Halberstam*'s third prong, Appellants must plead allegations to render it plausible "the defendant . . . knowingly and substantially assist[ed] the principal violation." *Halberstam*, 705 F.2d at 477. When determining whether this prong has been satisfied, courts generally turn to six different factors, as put forth in *Halberstam*: (i) the nature of the act assisted; (ii) the amount and kind of assistance;

(iii) the defendants' presence at the time of the tort;[6] (iv) the defendants' relationship to the tortious actor; (v) the defendants' state of mind; and (vi) the duration of assistance. *See Halberstam*, 705 F.2d at 483–84. "No factor is dispositive; the weight accorded to each is determined on a case-by-case basis." *Honickman*, 6 F.4th at 500. Each factor is considered below in turn.

**Nature of the Act Assisted:** This particular factor "requires assessing whether the alleged aid (providing compensation and a platform to the [intermediaries]) would be important to the nature of the injury-causing act (Hamas's Terror Attack)." *Id*. Here, Appellants have adequately pled such, chiefly by demonstrating the import of harnessing and controlling local media to ensure dissemination of only Hamas-approved content. *See generally* Doc 99-17 (Burns Report).

The AP's decision to publish the photographs of Hamas affiliates provided invaluable support for a key aim of Hamas's bloodshed on October 7: to terrorize Jews by demonstrating (in real-time) what Hamas intends for them all in the future, to command the world's rapt attention, and awaken western sympathy for their sickening "resistance." The propaganda element of the Terror Attack was in many ways as important to Hamas as the violence itself, as Hamas has made clear in its charter and as experts on terrorist organizations cited by Appellants have explained.

[6] This factor plays little to no role in an intermediary liability case.

*Id.*; SAC, ¶¶ 6, 37–39, 59–62, 70, 122–127. As has been well-established, the AP's support of the media goals of Hamas goes back many years. *See, e.g.*, SAC, ¶ 62. Thus, Appellee engaged in an ongoing, systematic enterprise of support in which the instant case is just one transaction of many. *See Twitter*, 598 U.S. at 496.

Furthermore, providing regular compensation over an extended period of time to a Hamas affiliate *who engages in actual acts of terror* more than qualifies as material support to Hamas. This case mirrors that of *Jan v. People Media Project*, where the court determined that a magazine could be held liable for acts of terror committed by its "contributor" if that contributor is a member of Hamas and was receiving payment from the magazine. 783 F. Supp. 3d at 1306–1307. As is the case here, the contributor in question in *Jan* was *not* a full-time employee. *Id.*

**Amount and Kind of Assistance:** Money is invaluable to an FTO and is regarded as the quintessential form of material support. *Miller v. Arab Bank, PLC*, 372 F. Supp. 3d 33, 45 (E.D.N.Y. 2019) ("'[G]iving money to Hamas, like giving a loaded gun to a child (which also is not a violent act), is an act dangerous to human life' under the ATA." (quoting *Boim v. Holy Land Found. for Relief & Dev.*, 549 F.3d 685, 690 (7th Cir. 2008)). The district court, without citation to any case, dismisses the notion that regularly paying Hamas affiliates who knowingly spread Hamas propaganda can be linked to Hamas's acts of terror, Order at 19–20, running

counter to most recent case law on this very question. *See Jan v*, 783 F. Supp. 3d at 1306–1307.

Furthermore, "[a] court might also apply a proportionality test to particularly bad or opprobrious acts, i.e., a defendant's responsibility for the same amount of assistance increases with the blameworthiness of the tortious act or the seriousness of the foreseeable consequences." *Halberstam*, 705 F.2d at 484 n.13. October 7, the deadliest day for the Jews since the Holocaust, was especially monstrous; the photographs taken by the Terror Attack Participants, paid for and published by the AP, were invaluable to Hamas's framing of that horrible day as "resistance" to achieve its *raison d'etre* of exterminating the Jews and the Jewish state. *Any* assistance to perpetrating the events of that day may thus be perceived as particularly harmful.

**Relationship to FTO:** Courts assessing this factor are to conduct "an evaluation of how attenuated the relationship is between the defendant and the FTO." *Wildman v. Deutsche Bank Aktiengesellschaft*, No. 21-CV-04400 (HG) (RML), 2022 WL 17993076, at *8 (E.D.N.Y. Dec. 29, 2022). Appellee paid the Terror Attack Participants for years, including for their "coverage"—read participation—in October 7. Appellee also engaged in a long-term relationship with Hamas over some ten years consisting of granting Hamas editorial control over its coverage of conflicts in Gaza. Particularly here, this factor shocks the conscience.

*Cf. Twitter, Inc. v. Taamneh*, 598 U.S. 471, 500 (2023) ("[Twitter's] relationship with ISIS and its supporters appears to have been the same as [its] relationship with [its] billion-plus other users: arm's length, passive, and largely indifferent.").

**The AP's State of Mind:** As detailed above, the district court erroneously rejected that Appellee had the requisite state of mind to be held liable, insisting "this alleged support provided by the AP evidences a significantly lesser intent to participate in a terrorist act than in other cases finding a culpable state of mind under this analysis." Order at 20. This is incorrect. In contrast to ATA cases concerning banks providing incidental banking services to intermediaries linked to FTOs, *see, e.g.*, *Kaplan v. Lebanese Canadian Bank, SAL*, 999 F.3d 842, 862 (2d Cir. 2021), the AP has engaged in a long-term enterprise of abdicating editorial control to Hamas and its affiliates, even sharing a building with the FTO at one point. SAC, ¶ 38. In exchange, the AP gets "exclusive" access to Hamas "events." Contradicting the well-pled allegations, the district court then characterizes the AP's relationship with Gazan-based "journalists," including Eslaiah, as "arm's-length," Order at 20, despite the fact AP has maintained a very beneficial relationship with Eslaiah specifically (keeping him on long after the AP was alerted to his involvement with an FTO) and Hamas generally.

**Duration of Assistance:** Under *Halberstam*, "[t]he length of time an alleged aider-abettor has been involved with a tortfeasor almost certainly affects the quality

and extent of their relationship and probably influences the amount of aid provided as well; additionally, it may afford evidence of the defendant's state of mind." *Halberstam*, 705 F.2d at 484. Appellee's knowledge of Eslaiah's half decade (at least) with Hamas is more than a sufficient period of time to establish a genuine relationship with an FTO affiliate—and to become aware that something illegal was afoot. *See id.* at 487. With regard to the remaining Terror Attack Participants, their ties to Hamas—and the AP's willingness to pay them—are representative of the AP's years-long practice to cede control of its media coverage to Hamas.

### H. Appellants' Allegations Demonstrate Conscious and Culpable Participation, As Well As Systematic and Pervasive Support, as Put Forth in *Twitter*

Appellants' allegations satisfy the *Twitter* standard as they demonstrate an ongoing arrangement of constant support between the AP, the Terror Attack Participants, and Hamas. The district court found Appellants failed to plead knowing and substantial assistance because "[t]here is no allegation that the AP knew of the October 7 Attack prior to its commission." Order at 16. But Appellants are simply not required to do so under *Twitter*. Systemic, routine assistance over a long period of time lessens the degree to which a plaintiff must tie the support provided to the specific terror attack at issue. Indeed, "[i]n appropriate circumstances, a secondary defendant's role in an illicit enterprise can be so systemic that the secondary

defendant is aiding and abetting every wrongful act committed by that enterprise—as in Halberstam itself." *Twitter*, 598 U.S. at 496.

In *Halberstam*, Linda Hamilton simply provided bookkeeping services over several years to Bernard Welch, who killed Michael Halberstam during a burglary. Hamilton was unaware of the specific burglary that brought about Halberstam's death, yet she nonetheless was held liable for his death. *Halberstam*, 705 F.2d at 487. Just as Linda Hamilton collected an income from Bernard Welch, AP handily benefited from its arrangement with the Terror Attack Participants insofar as it gained unparalleled access to Hamas for years, thereby providing exclusive content to its millions of readers. Through Eslaiah, the support provided by the AP to Hamas spanned at least five years, to the point that [redacted]. Despite being warned of his ties to Hamas as early as 2018, the AP continued to employ Eslaiah for his services, culminating in his participation in the October 7 terror attacks.

The district court errs again when it reduces Appellants' allegations of material support to simply the publication of images. According to the district court, "Even if Plaintiffs had sufficiently alleged . . . [Eslaiah's] ties to Hamas and the AP's awareness of the same, it is not clear what terroristic views were disseminated here or what terrorist endeavors were supported via the AP's publication of truthful

images such that their publication would demonstrate the AP's knowledge of their own role in furthering Hamas propaganda." Order at 17. This conclusion is incorrect.

***First***, Appellants properly plead the material support *also* consisted of remuneration for the "services" of Hamas affiliates. Employing even just *one* member of a terrorist organization can constitute material support and thereby rise to aiding-and-abetting. *See, e.g.*, *Jan*, 783 F. Supp. 3d at 1306–1307 (finding nonprofit's presumed regular payment to contributing writer who happened to be a member of Hamas constituted material support of Hamas).

***Second***, the AP's willingness to publish materials produced by Hamas affiliates is part of the AP's longstanding arrangement with Hamas to publish only Hamas-approved materials, as outlined in detail by former AP writer, Matti Friedman. Therefore, for the purposes of aiding-and-abetting liability, it is not necessarily the content of these particular photographs that is problematic but rather what they represent—the systematic infiltration of the AP by Hamas, so much so that the organization simply publishes Hamas materials, and that this arrangement between the AP and Hamas is so deeply entrenched that a Hamas affiliate can commit acts of terrorism and simultaneously do his job for the AP.[7]

---

[7] The First Amendment challenges the AP raised below were not addressed by the district court, doc 154 at 28, and therefore the Court should "decline to do so here in the first instance." *MSP Recovery Claims, Series LLC v. Metro. Gen. Ins. Co.*, 40 F.4th 1295, 1306 (11th Cir. 2022) ("[W]e generally will not consider issues which the district court did not decide." (internal citations and quotations omitted)).

At some point in the years leading up to and on October 7, the AP knew or must have suspected their "journalists" reporting from within the scenes of Hamas terror attacks were FTO affiliates. When Hamas is torturing, murdering, and kidnapping everyone but their operatives, and the AP's "journalists" are standing right by Hamas throughout, there is no credible conclusion beyond one: these "journalists" are Hamas. The AP's choice to then continue to assign them, pay them, and publish their photographs constituted aiding-and-abetting an FTO in violation of the ATA and the coextensive Florida state law.

## Conclusion

For the foregoing reasons, Appellants respectfully request this Court reverse the district court's Order dismissing Appellants' SAC for failure to properly adjudicate a motion to dismiss, and for misapplication of the law with respect to Count I, and to remand for further proceedings.

Date: December 2, 2025

Respectfully submitted,

*/s/ Etan Mark*
Etan Mark
Mark Ferrer & Hayden
80 SW 8th Street, Ste 1999
Miami, FL 33130
305.374.0440
etan@mfh.law

*- and -*

*/s/ David Schoen*
David I. Schoen
Schoen Law Firm, LLC
2800 Zelda Road, Suite 100-6
Montgomery, AL 36106
334.395.6611
schoenlawfirm@gmail.com

*- and –*

*/s/ Mark Goldfeder*
Mark Goldfeder
Rachel Sebbag
National Jewish Advocacy
Center
1954 Airport Road, Suite 1196
Atlanta, GA 30341
332.278.1100
mark@njaclaw.org
rachel@njaclaw.org

*Attorneys for Appellants Noach Newman, Adin Gess, and Natalie Sanandaji*

## Certificate Of Compliance

In accordance with Federal Rule of Appellate Procedure 32(a)(7)(B), I certify that the foregoing Plaintiffs-Appellants' Brief uses Times New Roman 14-point font and contains 12,949 words. This 2nd day of December, 2025.

By: */s/ Etan Mark*

Etan Mark
Mark Ferrer & Hayden
80 SW 8th Street, Ste 1999
Miami, FL 33130
305.374.0440
etan@mfh.law

**Certificate Of Service**

I certify that on February 11, 2026, I electronically filed the foregoing Plaintiffs-Appellants' Brief with the Clerk of Court for the United States Court of Appeals for the Eleventh Circuit by using the CM/ECF system, which will send notification of such filing to the counsel of record in this matter.

By: *<u>/s/ Etan Mark</u>*

Etan Mark
Mark Ferrer & Hayden
80 SW 8th Street, Ste 1999
Miami, FL 33130
305.374.0440
etan@mfh.law